**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TAKISHA CORBIN for K.C., | ) | CASE NO. 1:12-CV-2732 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Takisha Corbin ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Commissioner of Social Security ("the Commissioner"),[1] denying the application of Plaintiff's cousin and legal ward, K.C. ("Claimant"), for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On March 23, 2009, Plaintiff filed an application for SSI on behalf of Claimant. (Transcript ("Tr.") 14.) The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On June 1, 2011, an ALJ conducted Claimant's hearing. (*Id.*) Claimant participated in the

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. She is automatically substituted as the defendant in this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

hearing and was represented by an attorney.  (*Id.*)  Plaintiff also participated in the hearing.  (*Id*.)  On July 8, 2011, the ALJ found Claimant not disabled.  (Tr. 11.)  On September 27, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1-10.)

On November 11, 2012, Plaintiff filed a complaint on behalf of Claimant challenging the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17 and 19.)

Plaintiff asserts the following assignments of error: (1) the ALJ's finding that Claimant's cognitive disorder and ADHD do not meet or equal listing 112.05 lacks substantial evidence, and (2) the ALJ's finding that Claimant has less than marked limitations under the domains lacks substantial evidence.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Claimant was born on November 12, 2000, and was a school-age child on the date Plaintiff filed his application for SSI and on the date of his administrative hearing. (Tr. 17.)  Claimant had not engaged in substantial gainful activity at any time relevant to the disposition of his application.  (*Id.*)

### B.   Medical Evidence and School Reports

The Cuyahoga County Department of Children and Family Services has been involved with Claimant since he was a toddler due to his mother's history of substance abuse as well as reports that he was physically abused by his mother's paramour.  (Tr. 17, 419.)  Plaintiff, Claimant's maternal cousin, now has custody of him. (*Id.*)

2

Claimant has demonstrated learning and behavioral difficulties since kindergarten.  On February 4, 2008, Claimant's kindergarten teacher, Sue Ann Silagy, reported that Claimant would be retained in kindergarten for a second year due to his inability to retain kindergarten level information or to be successful in first grade.  (Tr. 337.)  Ms. Silagy noted that some of Claimant's issues may have stemmed from his living environment, given that he "bounced around from home to home w[ith] little continuity."  (Tr. 338.)  During kindergarten, Claimant was disciplined on several occasions for fighting and refusing to follow directions.  (Tr. 251-254, 416.)

In May 2008, Claimant's school conducted an Evaluation Team Report ("ETR") to determine Claimant's eligibility for special education services.  (Tr. 344.)  At that time, Claimant was continuing his second year of kindergarten and was residing with Ms. Owens, Claimant's foster parent.  (*Id.*)  Claimant's teacher had indicated that Claimant was showing minimal progress both behaviorally and academically, and that the level of support needed for Claimant to progress "may be beyond the scope of regular education alone."  (Tr. 344-345.)  During administration of the Kaufman Test of Educational Achievement, Second Edition ("KTEA-II"), Claimant needed to be prompted several times to stay on task.  (Tr. 345.)  He scored mostly in the Below Average to Lower Extreme range.  (*Id.*)  On the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"), Claimant was extremely fidgety and had to be prompted constantly to sit in his seat or pay attention to the task at hand.  (Tr. 346.)  Claimant's scores on the WISC-IV fell in the borderline range.  (*Id.*)  He attained a full-scale I.Q. score of 71 (third percentile), verbal comprehension of 77 (sixth percentile), perceptual reasoning of 75 (fifth percentile), working memory of 86 (sixteenth percentile), and processing speed

3

of 70 (second percentile).  (*Id.*)

On the Adaptive Behavior Assessment System, Second Edition ("ABAS-II"), which measures practical skills required to function and meet environmental demands, care for oneself, and interact with others, Claimant performed in the "extremely low" range, with a social score in the 0.5 percentile, a practical score in the less than 0.1 percentile, a conceptual score in the 2.3 percentile, and a general adaptive composite score in the 0.2 percentile.  (Tr. 348.)  The Achenbach Teacher Report Form ("TRF") placed Claimant in the clinical range for social and behavior problems, including thought problems, attention problems, rule breaking behavior, and aggressive behavior.  (Tr. 349.)  Claimant's classroom teacher rated him as working much less hard, behaving much less appropriately, learning much less, and being much less happy compared to typical students of the same age.  (*Id.*)  According to a teacher's report, Claimant had difficulties with interacting appropriately with peers, following rules and directions, verbal and physical aggression, and impulsiveness.  (Tr. 355.)  Teacher reports also indicate that Claimant appeared to have the fine and gross motor skills needed in order to participate in the general education curriculum without specific accommodations or modifications.  (Tr. 348.)

Claimant's ETR recommended that he receive speech and language services in the areas of receptive language with goals focusing on understanding concepts, following directions, and listening comprehension.  (Tr. 354.)  Furthermore, the ETR concluded that Claimant had a cognitive disability due to his I.Q., academic performance, and adaptive behavior.  (Tr. 361.)  As a result, Claimant was eligible for special education services.  (Tr. 362.)  Claimant's school developed an Individualized

4

Education Program ("IEP"), which provided accommodations for the difficulties he experienced due to his attention deficit hyperactivity disorder ("ADHD") and cognitive disorder.  (Tr. 293-334.)

In August 2008, Claimant began treatment at Applewood Centers, Inc. ("Applewood").  (Tr. 367.)  Claimant's treatment focused on improving coping skills, anger management, impulse control, school behavior, concentration, and academic functioning.  (Tr. 402-404.)  Ms. Jodie Beaver, LPCC, conducted an initial assessment in August 2008.  (Tr. 412-425.)  She diagnosed ADHD combined type and adjustment disorder based on Claimant's hyperactive, impulsive, and inattentive behavior, his difficulties interacting with others, and his difficulties controlling emotions and expressing feelings.  (Tr. 420-424.)  Ms. Beaver noted that Claimant needed symptom and disability management skills, restoration or development of social/personal skills, and education related services to develop skills necessary to enhance his academic success.  (Tr. 421.)

In September 2008, Dr. Zarah, D.O., conducted a psychiatric evaluation of Claimant after he was suspended from school for choking a classmate and hitting a teacher.  (Tr. 406-408.)  Dr. Zarah explored Claimant's history of violent outbursts, physical aggression, and continued struggles with reading and recognizing symbols and words.  (Tr. 406-409.)  On examination, Dr. Zarah observed that Claimant gave only simple, four to five word answers and displayed minimal eye contact, limited memory, poor attention, and a lower vocabulary and fund of knowledge than what is expected for his age.  (Tr. 410.)  Dr. Zarah diagnosed ADHD combined type and assigned a global

5

assessment of functioning ("GAF") score of 41.[2]  (Tr. 411.)

In October 2008, Tori Cordiano, MA, Psychology Intern at Applewood, referred Claimant to Frank R. Ezzo, Ph.D., for a psychological evaluation.  (Tr. 364-382.)  The referral noted that Claimant had been previously diagnosed with ADHD and Oppositional Defiant Disorder.  (Tr. 370.)  Dr. Ezzo reported that Claimant was very cooperative, friendly, and well-behaved throughout the evaluation, and that he was motivated throughout the testing session and appeared to put forth his best effort.  (Tr. 367.)  The Connors 3 assessment – a thorough and focused assessment of ADHD – confirmed Claimant's ADHD with 99 percent probability.  (Tr. 369.)  Dr. Ezzo's evaluation also confirmed the diagnosis of Oppositional Defiant Disorder.  (Tr. 370.)  Dr. Ezzo further diagnosed neglect of child and physical abuse of child and estimated a GAF of 50,[3] indicating serious impairment in overall social and educational functioning.  (*Id.*)  Dr. Ezzo recommended continued psychiatric management of Claimant's medication, and noted that Claimant might need to be placed in a classroom setting with a teacher's aid to provide for his educational needs on the basis of a cognitive disability rather than be placed in special education.  (Tr. 371.)

---

[2]  The GAF scale rates an individual's overall psychological functioning from 0 for inadequate information to 100 for superior functioning.  *See Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 503 n.7 (6th Cir. 2006).*  A GAF score between  41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[3]  A GAF score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.   *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

6

In April 2009, Claimant transferred schools, triggering an update to his IEP.  (Tr. 183.)  The updated IEP noted that Claimant requires a single classroom environment for all core academics due to his need for intensive academic interventions that could not be addressed in a regular education classroom with accommodations and modifications.  (Tr. 188.)  Claimant also requires accommodations for testing; he has test questions read to him, cuing for on-task behavior, placement in a small group with preferential seating, and extended time.  (Tr. 194.)

On May 6, 2009, the Positive Education Program ("PEP") concluded services because Claimant had recently been placed in the custody of his cousin, Plaintiff, and was adjusting to his new home and doing well in school.  (Tr. 157.)  PEP had provided case management services to Claimant for symptoms of post-traumatic stress disorder, adjustment disorder with mixed disturbance of emotions and conduct, disruptive and aggressive classroom behavior, and inappropriate social behavior.  (Tr. 159-163.)  On May 11, 2009, Plaintiff completed a function report, noting that Claimant's ability to progress in learning was limited.  (Tr. 170.)  Plaintiff also reported concerns about Claimant acting out at school and being unable to sit still.  (Tr. 179.)  On May 14, 2009, Applewood records showed that Claimant had made significant academic and behavioral improvements while complying with his psychiatry treatment.  (Tr. 405.)  Plaintiff denied that Claimant had any significant behavior problems within the past three weeks.  (*Id.*)

On May 31, 2009, Claimant's special education teacher, Ms. Kehoe, reported on a teacher questionnaire that Claimant displays "serious" problems with comprehending oral instructions, understanding school and content vocabulary, and applying problem-

7

solving skills in class discussions, and "very serious" problems with expressing ideas in written form.  (Tr. 140.)  Ms. Kehoe noted that Claimant has trouble focusing in activities, is out of his seat two or more times during each 50-minute class period, and constantly needs extra assistance to complete his daily classwork.  (*Id.*)  Ms. Kehoe also noted that Claimant has "very serious" problems in other areas including, but not limited to, working without distracting himself or others, paying attention when spoken to directly, and expressing anger and handling frustration appropriately.  (Tr. 141-142, 144.)

On August 17, 2009, psychologist David V. House, Ph.D., evaluated Claimant. (Tr. 385-390.)  Dr. House observed Claimant displaying deficient attention and concentration, very restless behavior, choppy pace, fair persistence, and 90 percent speech comprehensibility.  (Tr. 388.)   He noted that Claimant could sit for meals, play video games, swim, watch television, do his homework, and do his chores if his cousin shows him how.  (Tr. 387-388.)   Claimant had no indications of mood disturbance or mood swings, and his level of speech was adequate without difficulty in articulation and without odd sounds or word substitutions.  (Tr. 388.)  He was oriented for person, partially for place, and partially for time.  (*Id.*)  Claimant indicated that he was happy, denying any excessive sadness or worry.  (*Id.*)  Dr. House opined that, with respect to pace, persistence, and task completion, Claimant functioned at two-thirds of the average for a child his age.  (Tr. 389.)  He also opined that Claimant's concentration and attention along with social, emotional, and behavior patterns are one-half of average functioning for a child his age, and his intellectual skills appeared to be two-thirds of average functioning for a child his age (although Dr. House did not perform an

8

academic assessment.)  (*Id.*)  Dr. House diagnosed ADHD, physical abuse of child in the past, and neglect of child in the past, and deferred any academic diagnoses.  (Tr. 389.)

On September 1, 2009, Claimant treated at Applewood with clinical nurse specialist Toby Bourisseau and psychiatrist Florence Kimbo.  (Tr. 400.)  Claimant reported that he had a good summer and had recently started second grade and was doing well so far.  (*Id.*)  Claimant had restarted his medication and had no reported side effects.  (*Id.*)  On examination, Claimant was pleasant and polite, played well with his cousin, and reported a good mood and a full affect.  (*Id.*)  In October 2009, on examination by Mr. Bourisseau, Claimant reported doing well in school and receiving all satisfactory marks on his progress report.  (Tr. 399.)  Claimant's reading had improved, he was doing well at home, and he was taking his medications as prescribed with no reported side effects.  (*Id.*)  Mr. Bourisseau continued Claimant on his medications. (*Id.*)

On October 27, 2009, Etina Davis, M.A./CCC-SLP, evaluated Claimant's speech and language skills and found that his conversational speech was at least 90 percent intelligible in both known and unknown contexts to unfamiliar listeners.  (Tr. 430.)  Claimant displayed a moderate receptive language deficit (1.7 standard deviations below the mean) and a mild expressive language deficit (1.1 standard deviations below the mean).  (Tr. 430-431.)  Overall, Claimant's pragmatic (social) language skills were within normal limits for his age.  (Tr. 431.)  The prognosis for improved communication was "good based on [Claimant]'s young age, his willingness to participate in speech intervention, and strong parental/familiar support and concern."  (*Id.*)  Ms. Davis recommended weekly speech therapy to address Claimant's communication deficits.

(*Id.*)

On January 7, 2010, nurse Bourisseau and Dr. Kimbo again found that Claimant was doing well in school and at home.  (Tr. 426.)  On examination, Claimant was pleasant and polite, reported a good mood and full affect, and had a clear thought process.  (*Id.*)  Mr. Bourisseau noted that Claimant had made some progress with reducing inattention, impulsivity, and hyperactivity.  (*Id.*)

Claimant's school updated his IEP again in February 2010 when Claimant was in second grade.  (Tr. 400-455.)  Claimant's basic mathematics skills were at the second grade level, and his grammar and writing skills were at the third grade level, although he had difficulty with receptive language skills and required continuing speech-language services.  (Tr. 441.)   Claimant's IEP concluded that he still required accommodations for his attention deficits, off-task behavior, and easy distractibility, and he also required continued accommodations for mathematics, vocabulary acquisition, and reading.  (Tr. 443-447, 452-455.)  Claimant's accommodations included 50 percent more time on tests than his peers, small group instruction, frequent breaks, repetition of instructions, tests read to him, preferential seating, and modified/abbreviated assignments.  (Tr. 448-451.)

In April 2010, Applewood treatment records showed that Claimant had no major issues at home, but that his academic progress had declined.  (Tr. 426.)  His report card showed Bs, Cs, and one D in Math, and he had been suspended about three times for fighting.  (*Id.*)  He had been taking his medication as prescribed with no reported side effects.  (*Id.*)

On August 17, 2010, registered nurse Camille Davis treated Claimant at

10

Applewood.  (Tr. 486.)  Ms. Davis noted that Claimant was taking his medications as prescribed without side effects.  (*Id.*)  Plaintiff reported that Claimant had been doing well overall at home and planned to start third grade in the fall.  (*Id.*)  On examination, Claimant's mood was normal and his affect appropriate, his thought process was logical and coherent, he was pleasant, cooperative, and easily engaged, and his speech was normal.  (*Id.*)

On August 30, 2010, Anita Watson, M.D., evaluated Claimant.  (Tr. 489.)  Dr. Watson noted that Claimant's behaviors did not create problems at home, but did raise issues at school.  (*Id.*)  Dr. Watson reported that Claimant struggled with distractions, stress, and tasks requiring attention to detail due to impulsive, inattentive, and hyperactive symptoms of ADHD.  (*Id.*)  Dr. Watson also noted that "mom"[4] withheld Claimant's medication over the summer because she wanted to wean him off of it, but that she restarted his medication for school.  (*Id.*)  The decision to remove Claimant from his medication was not made with consultation or approval from Claimant's doctors or teachers.  (*Id.*)

On November 16, 2010, Plaintiff treated with Donna Zajc, RNC, at Applewood. (Tr. 494.)  At the time of his visit, Claimant had been off of his medication for about one month because Plaintiff believed it was causing him stomach pain and interrupting his sleep.  (Tr. 494.)  Plaintiff stated that teachers had been calling to report that Claimant was disruptive, unable to focus on his work, and fighting in gym class.  (*Id.*)  At home, Claimant had intentionally burned his younger cousin with a hot fork.  (*Id.*)  On

---

[4]       It is unclear whether Dr. Watson was referring to Claimant's biological
        mother or to Plaintiff.

examination, Claimant was pleasant and polite and had a good mood and full affect, a clear thought process, and normal speech.  (*Id.*)  Nurse Zajc restarted Claimant on Adderall to target his inattention, impulsivity, and hyperactivity.  (*Id.*)

In February 2011, when Claimant was in third grade, his school updated his IEP.  (Tr. 229-242.)  The IEP noted that Claimant is very cooperative and helpful to other students, he does well in small group settings, and he does an excellent job acting as a leader in class discussions.  (Tr. 230.)   It further noted that Claimant struggles outside of the small group setting, he has difficulty with transitions from one classroom setting to other settings around the school, and he "needs to spend more time focusing on school related tasks."  (Tr. 230, 236.)  The IEP also reported that Claimant did not have a speech/language deficit, and that his speech and language performance was equal to, or better than, his cognitive performance on standardized testing.  (Tr. 230.)

On April 13, 2011, Claimant attained a full scale I.Q. score of 70 and a working memory score of 68 on the WISC-IV, both at the second percentile.  (Tr. 510, 529.)  Claimant's verbal comprehension score of 71 was in the third percentile, his perceptual reasoning score of 77 was in the sixth percentile, and his processing speed was in the thirteenth percentile.  (Tr. 510.)  The evaluator explained that Claimant's weakest area, working memory, is closely related to achievement and learning.  (Tr. 511.)  Claimant's scores demonstrate that his general intellectual functioning is at a level that would make it extremely difficult to follow the learning pace of the general curriculum.  (Tr. 511, 530-531.)

In conjunction with the update to Claimant's IEP in 2011, intervention specialist Rosalind DuBose-Butler completed an assessment.  (Tr. 514.)  Ms. Dubose-Butler

reported that Claimant has an average ability to read fluently and recognize previously taught vocabulary and a below average ability to comprehend complex sentence structure, comprehend age- and/or grade-appropriate text, and follow sequence of written directions.  (*Id.*)  She reported Claimant could write simple sentences but needed to improve his grammar and punctuation and include details in his writing prompts.  (Tr. 517.)  Claimant's mathematics grade was a C, his written expression grade was a B, and his reading/language arts grade was a B.  (Tr. 514, 516, 518.)  According to Ms. DuBose-Butler, Claimant "has problems following school rules in settings outside the special education classroom."  (Tr. 520.)  She also noted that Claimant "is not very thorough in completing independent work" and "often makes mistakes because he's working so fast."  (Tr. 519.)

On May 23, 2011, Ms. DuBose-Butler completed a functional equivalence questionnaire.  (Tr. 539-542.)  She opined that Claimant has marked[5] limitations in the following areas: acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Tr. 539-540.)  Ms. DuBose-Butler concluded that Claimant had no evidence of limitations in the following areas: moving about and manipulating objects, caring for self, and health and physical well-being.  (Tr. 540-541.)  She confirmed that Claimant receives accommodations, including a single classroom environment, the assistance of an intervention specialist, and a daily behavior contract.  (Tr. 541.)

---

[5]     The questionnaire defined "marked" as interfering seriously with the child's ability to function independently, appropriately, and effectively in an age appropriate manner.  (Tr. 539.)

C.    Agency Reports and Assessments

On September 12, 2009, Joan Williams, Ph.D., conducted an evaluation based on her review of Claimant's records.  (Tr. 391-396.)  Dr. Williams noted that Claimant had been diagnosed with ADHD, oppositional defiant disorder, and borderline intellectual functioning ("BIF").  (Tr. 391.)  She opined that Claimant's impairments were severe but did not meet, medically equal, or functionally equal the Social Security listings.  (*Id.*)  Dr. Williams found that Claimant had less than marked impairments in his ability to acquire and use information, his ability to attend and complete tasks, and his ability to interact and relate with others.  (Tr. 393-394.)  She found that Claimant had no limitation in his ability to care for himself.  (Tr. 394.)  Dr. Williams based these findings on, among other things, Dr. House's consultive examination results.  (*Id.*)

In November 2009, Malika Haque, M.D., Karen Carver, M.A., and Dr. Williams conducted a review of Claimant's medical and educational records.  (Tr. 434.)  Consistent with what Dr. Williams had previously opined, they determined that Claimant's impairments were severe but did not meet or equal a listing to be considered disabled.  (Tr. 434.)  They found that Claimant had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Tr. 436.)

On July 21, 2010, Louis Goorey, M.D., Melissa Hall, M.A., and David Dietz, Ph.D., reviewed Claimant's records and determined that he did not have an impairment or combination of impairments that warranted finding him disabled under the listings.  (Tr. 480-483.)  They determined that Claimant had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and

14

relating with others.  (Tr. 482.)  They noted that Claimant was doing well and adjusting to his new home with Plaintiff.  (Tr. 483.)

### D.    Hearing Testimony

#### 1.    Claimant's Hearing Testimony

At his June 1, 2011, hearing, Claimant testified as follows:

Claimant was 10 years old and in third grade.  (Tr. 45-46.)  He liked going to school and had some friends at school and at home.  (Tr. 46-47.)  He went to tutoring after school and received help with his homework from his cousin, Plaintiff.  (Tr. 47.)  After finishing his homework each night, he watched TV or did his chores, such as cleaning the bathroom and sweeping his room.  (Tr. 48.)  He sometimes argued with his nine-year-old cousin and had hit him.  (Tr. 49-50.)

#### 2.    Plaintiff's Hearing Testimony

At Claimant's hearing, Plaintiff testified as follows:

Plaintiff had been Claimant's legal guardian since 2008.  (Tr. 52.)  Claimant did his chores at home after Plaintiff reminded him several times.  (Tr. 54.)  Claimant and his nine-year-old cousin (Plaintiff's son) constantly fought with each other, often physically.  (Tr. 55.)

Claimant was "doing okay" in school as far as his grades, but was acting out. (Tr. 56.)  Plaintiff had taken Claimant off of his medication for an entire school year because she thought she was "doing the right thing," but she was in the process of getting him back on it.  (*Id.*)  Plaintiff did not want Claimant to take any medication, but did not feel that she had any other choice, as the medication "helped him a little bit."

15

(Tr. 57.)  Claimant was suspended at least five times during the past school year.  (Tr. 56.)  His teacher had a "behavior chart" that Claimant had to bring home to Plaintiff every day so that she could see how he was doing in school.  (Tr. 57.)

Claimant liked to play football and wanted to do boxing.  (Tr. 58.)  Even when he played sports, he still was not "focused."  (*Id.*)  He bullied other kids at school and picked fights.  (*Id.*)  He had a problem with lying.  (Tr. 59.)  Claimant would not do his homework unless Plaintiff made him do it.  (*Id.*)  He had the most trouble with reading and math.  (*Id.*)

Claimant occasionally had contact with his mother, but Plaintiff tried to avoid it because it caused problems.  (Tr. 60.)  Claimant's mother did not discipline him.  (*Id.*)  "So it's like if he don't get his way, he throws a tantrum.  He balls up his fist at her."  (Tr. 60-61.)

A couple of times when Claimant was taking his medication, Plaintiff caught him putting paper on fire.  (Tr. 62.)  He once stuck a fork in fire and put in on his younger cousin's back.  (*Id.*)

### III.    STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if he has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last, for a continuous period of not less than 12 months.  *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for

determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R.

§ 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's]

ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a

child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(3)(i).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Claimant was born on November 12, 2000.  Therefore, he was a school-age child on March 23, 2009, the date Claimant filed the application, and is currently a school-age child.

2.    Claimant has not engaged in substantial gainful activity since March 23, 2009, the application date.

3.    Claimant has the following severe impairments: attention deficit hyperactivity disorder and low average cognitive functioning.

4.    Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Claimant does not have an impairment or combination of impairments that functionally equals the listings.  Claimant has less than marked limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others; and no limitation in the ability to care for himself, moving about and manipulating objects, and health and physical well-being.

6.    Claimant has not been disabled, as defined in the Act, since March 23, 2009, the date the application was filed.

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

18

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

### B.    Plaintiff's Assignments of Error

Plaintiff argues that the ALJ's finding that Claimant's cognitive disorder and ADHD do not meet or equal Listing 112.05 is not supported by substantial evidence. She also argues that the ALJ's finding that Claimant has less than marked limitations under the domains is not supported by substantial evidence.  The Court will address each argument in turn.

### 1.    Whether the ALJ Erred in Finding that Claimant Failed to Meet the Criteria for Listing 112.05.

19

Plaintiff argues that the ALJ erred by not finding that Claimant's ADHD and cognitive disorder met Listing 112.05 for mental retardation.  According to Plaintiff, the ALJ rejected sound evidence, including objective test results which meet the listing criteria, and failed to identify any evidence to support her conclusion that Claimant did not meet the listing.  The Commissioner responds that: the ALJ adequately explained how Claimant failed to meet the criteria for Listing 112.05; Claimant did not display significant deficits in adaptive functioning and his I.Q. test of 71 was most reflective of his actual functioning.

Under the Listings, mental retardation is "characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05.  To meet the level of severity required by this listing, a claimant must satisfy at least one of six criteria listed in section 112.05 and must also have significantly subaverage general intellectual functioning with deficits in adaptive functioning.  *Id.*  "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."  *West v. Comm'r Soc. Sec.*, 240 Fed.Appx. 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe,* 509 U.S. 312, 328, 113 S.Ct. 2637, 125 L.Ed.2d (1993)).

Plaintiff argues that the ALJ concluded, without explaining, that Claimant did not meet the criteria for Listing 112.05(D).  To satisfy this listing, a child must have a valid verbal, performance, or full scale I.Q. score of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05(D).  For an accurate

assessment under Listing 112.05, I.Q. test results must be sufficiently current.  *Id.*  Test results obtained between ages 7 and 16 should be considered current for two years when the I.Q. is 40 or above.  *Id.*

Here, Claimant's I.Q. was tested using the WISC-IV in 2008 and again in 2011. (Tr. 346, 510.)  The tests revealed full scale I.Q. scores of 71 and 70, respectively.  (*Id.*) In deciding that Claimant did not meet Listing 112.05(D), the ALJ considered Claimant's 2008 score of 71 rather than his 2011 score of 70, noting the following:

> While there is a valid full scale I.Q. scores [sic] between 60 through 70 and the child has another mental impairment (attention deficit hyperactivity disorder) which imposes an additional and significant limitation of function, I find the full scale I.Q. score of 71 much more indicative of the child's actual functioning.

(Tr. 18.)  In addition to rejecting Claimant's 2011 I.Q. score and finding that Claimant did not meet the I.Q. requirement of Listing 112.05(D), the ALJ found that Claimant did not demonstrate mental retardation characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.  (Tr. 18.)  According to the ALJ,

> [t]here is no evidence that the child suffers from mental incapacity such that he depends upon others for personal needs (grossly in excess of age-appropriate dependence) or is unable to follow directions such that the use of standardized measures of intellectual functioning is precluded.  The child was able to follow instructions adequately when intellectual testing was conducted in 2008 and more recently in 2010.  (exhs. 3F and 20F).

(*Id.*)

Plaintiff takes issue with the ALJ's finding that Claimant's I.Q. test of 71 was most reflective of his actual functioning.  Whether or not the ALJ offered an adequate explanation for giving more weight to Claimant's earlier score, it was improper for her to consider Claimant's 2008 I.Q. score of 71 while disregarding his 2011 score of 70 due to

21

the amount of time that had passed since the 2008 test was administered.  Since more than two years separate the March 2008 score and Claimant's June 2011 hearing, the 2008 I.Q. score was not "sufficiently current" for the ALJ to make an accurate assessment under Listing 112.05.[6]  Nonetheless, even though Claimant has a current I.Q. score of 60 through 70 and a mental impairment imposing an additional and significant limitation of function (attention deficit hyperactivity disorder), substantial evidence shows that Claimant has not demonstrated mental retardation characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.  The ALJ discusses this evidence at length.  (Tr. 18-31.)

With respect to Claimant's adaptive functioning, the ALJ notes that in May 2009, a psychologist at Applewood found that Claimant made significant improvements in his behavior since his IEP in September 2008.  (Tr. 21, 405.)  The ALJ also notes that by early 2011, Claimant did not have a speech/language deficit, and his speech and language performance was equal to, or better than, his cognitive performance on standardized testing.  (Tr. 21-22, 230.)  Claimant's multidisciplinary team reported in 2011 that Claimant works "very well" in small group settings, he is cooperative and helpful to other students, he participates in classroom discussions, and he does an excellent job acting as a leader in class discussions.  (Tr. 23, 230-231.)  As the ALJ points out, in May 2009, Plaintiff reported that Claimant keeps busy on his own, finishes things he starts, works on arts and

---

[6]    "IQ test results must also be sufficiently current for accurate assessment under 112.05.  Generally, the results of IQ tests tend to stabilize by the age of 16. . . .  IQ test results obtained between ages 7 and 16 should be considered current . . . for 2 years when the IQ is 40 or above."  20 C.F.R. Part 404, Subpart P, Appendix 1.

crafts projects, completes his homework, and completes his chores most of the time.  (Tr. 23, 174.)  Plaintiff also reported that Claimant has friends his own age and can make new friends, he generally gets along with her and other adults, and he plays team sports.  (Tr. 25, 172.)  The ALJ notes that in October 2009, Plaintiff reported that Claimant was doing well in school and had performed satisfactorily in all areas of his progress report.  (Tr. 23, 399.)  Plaintiff also indicated that Claimant's reading had improved and that he "has made a lot of progress."  (*Id.*) Additionally, the ALJ found that Claimant has no limitation in his ability to care for himself, and Plaintiff cites no evidence to the contrary.  (Tr. 28-29.)  Substantial evidence supports the ALJ's finding that Claimant does not have deficits in adaptive functioning.  As a result, the ALJ did not err in finding that Claimant did not meet Listing 112.05(D).

Plaintiff also includes one sentence in her Brief in which she addresses Listing 112.05(E): "Moreover, the ALJ seems to have only considered Listing 112.05(D), despite the opinion of the [consultative examiner] (upon which the ALJ placed 'substantial weight') establishing that Claimant meets the criteria for Listing 112.05(E) (Tr. 18-19, 388-389)." (Plaintiff's Brief ("Pl.'s Br.") at 15-16.)  It is unclear whether Plaintiff is challenging the ALJ's failure to specifically address Listing 112.05(E), or whether Plaintiff is arguing that Claimant meets Listing 112.05(E).  To the extent Plaintiff argues the latter, this argument is not well taken.  Listing 112.05(E) is satisfied when the child has a valid verbal, performance, or full scale I.Q. score of 60 through 70 and has a marked limitation in social functioning, a marked limitation in personal functioning, or a marked limitation in maintaining concentration, persistence, or pace.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05(E).  Plaintiff seems to suggest that Dr. House, who performed a consultative

23

examination of Claimant in August 2009, found that Claimant has one of the marked limitations required to meet the listing.  (Pl.'s Br. at 15-16.)  However, Dr. House did not specifically indicate in his report whether Claimant's limitations were "marked," and, besides citing to the relevant pages of Dr. House's report, Plaintiff has provided no support suggesting the same.  (Pl.'s Br. at 16, Tr. 388-389.)  Moreover, to the extent that Plaintiff takes issue with the ALJ's failure to specifically discuss Listing 112.05(E), this argument is without merit.  The ALJ found that "the child's impairments do not meet, or equal, the requirements of *any* listed impairment."  (Tr. 19) (emphasis added.)  This determination is supported by all seven of the state disability medical and psychological consultants who evaluated Claimant.   (Tr. 19, 391-396, 434-439, 480-485.)   Accordingly, and for the foregoing reasons, Plaintiff's first assignment of error provides no basis for remand in this case.

## 2.    Whether the ALJ Erred in Finding that Claimant had Less than Marked Limitations under the Domains

In determining whether the ALJ's factual findings are supported by substantial evidence, courts must examine the evidence in the record taken as a whole and take into account whatever in the record fairly detracts from its weight.  *See Wyatt v. Sec'y of Health & Human Servs., 974 F.2d 680, 683 (6th Cir. 1992).*  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy, 594 F.3d at 512.*  In this case, Plaintiff argues that, in analyzing the domains of functioning, the ALJ provided inadequate reasoning and support for her findings in the areas of acquiring and using information and attending and completing tasks.  Plaintiff's arguments are not well taken.

a.    **Acquiring and Using Information**

In assessing a claimant's functioning in the domain of acquiring and using

information, the agency considers "how well [a claimant] acquire[s] or learn[s]

information, and how well [a claimant] use[s] the information [he has] learned." 20

C.F.R. § 416.926a(g).  The regulations offer the following examples of limited

functioning in this domain: difficulty recalling important things learned in school the day

before; difficulty solving mathematics questions or computing arithmetic answers;

talking only in short, simple sentences and having difficulty making explanations.  20

C.F.R. § 416.926a(g)(3)(iii)-(v).  These examples, however, are not exhaustive, and do

not necessarily describe the degree of limitation in the domain at issue.  20 C.F.R. §

416.926a(g)(3).

The ALJ concluded that Claimant has less than marked limitations in acquiring

and using information.  (Tr. 21.)  The ALJ noted that, although Ms. DuBose-Butler's

May 2011 assessment indicated marked limitations in the area, Ms. DuBose-Butler is

not a medical doctor or psychologist and did not provide any clinical evidence of such

severe limitations to support her findings.  (*Id.*)  Plaintiff points to other evidence in the

record – including Ms. DuBose-Butler's 2011 report – that reflect Claimant's serious

limitations in this area.  Arguing that substantial evidence supports the ALJ's

conclusion, the Commissioner cites to, among other things, the assessments of agency

psychologists and speech and language pathologists who found that Claimant did not

have any marked impairments.

Here, substantial evidence supports the ALJ's conclusion that Claimant's

limitations in the area of acquiring and using information are less than marked, and the

ALJ discusses this evidence at length.  (Tr. 21-22.)  In May 2009, a psychologist at
Applewood noted that Claimant's report card showed improved academic performance
in the classroom.  (Tr. 21, 405.)  When Claimant was in the second grade, his basic
mathematics skills were at the second grade level, and his grammar and writing skills
were at the third grade level, despite his difficulties in other areas.  (Tr. 441.)  In
October 2009, Etina Davis, M.A./CCC-SLP, noted that Claimant "was engaging and
actively participated in the assessment.  He exhibited appropriate eye contact and
demonstrated good turn-taking skills.  He verbally requested objects and actions,
initiated communicative interactions, and responded appropriately to requests for
information and clarification during conversation."  (Tr. 431.)  She also noted that
Claimant's communication deficits "do not appear to adversely affect his ability to
effectively communicate his wants and needs for daily living."  (*Id.*)   In April 2010,
Claimant's report card showed Bs, Cs, and one D in Math.  (Tr. 426.)  Ms. DuBose-
Butler's February 2011 report noted that Claimant's current mathematics grade was a
C, his written expression grade was a B, and his reading/language arts grade was a B.
(Tr. 514, 516, 518.)  By early 2011, Claimant did not have a speech/language deficit,
and his speech and language performance was equal to, or better than, his cognitive
performance on standardized testing.  (Tr. 21-22, 230.)  Claimant's February 2011 IEP
reported that he "was able to retell events and answer questions in conversation" and
"is able to communicate effectively, both receptively and expressively."  (*Id.*)  At his
June 2011 hearing, Plaintiff testified that Claimant was "doing okay" in school as far as
his grades.  (Tr. 56.)  Claimant testified that he liked school and completes his

homework.  (Tr. 47.)

Furthermore, in evaluating Claimant's functional limitations, the ALJ gave substantial weight to the assessments of state disability medical and psychological consultants Drs. Joan Williams, Malika Hague, Louis Goorey, David Dietz, and John L. Mormal, as well as speech and language pathologists Karen Carver and Melissa Hall. (Tr. 19.)  All of these professionals concluded that Claimant did not have any marked impairments.  (Tr. 19, 393, 436, 482.)  Specifically, they found that Claimant's limitation in acquiring and using information was less than marked.  (*Id.*)  The ALJ also took intervention specialist Rosalind DuBose-Butler's opinion into consideration but did not rely upon all of it.  (Tr. 21.)  Specifically, Ms. DuBose-Butler found that Claimant had marked limitations in acquiring and using information, and the ALJ did not rely on this finding for the reason that it was not supported by any clinical evidence and did not come from a medical doctor or psychologist.  (Tr. 21.)  The regulations state that "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(I).  In this case, the ALJ made it clear that she considered Ms. DuBose-Butler's findings and gave a reason for qualifying her reliance on them.  (Tr. 21.)  Moreover, even if Ms. DuBose-Butler's report constituted substantial evidence in support of the conclusion that Claimant was markedly limited in the area, remand of this case would not be necessary, as the ALJ's conclusion is supported by substantial evidence.  *See Ealy*, 594 F.3d at 512 ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion.").  In view of all the other countervailing evidence, there is record support for the ALJ's conclusion

27

that Claimant was not markedly impaired in acquiring and using information.

### b.    Attending and Completing Tasks

The domain of attending and completing tasks involves "how well [a claimant] is able to focus and maintain . . . attention, and how well [he] begin[s], carr[ies] through, and finish[es] . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them."  20 C.F.R. § 416.926a(h).  Examples of limitations in this domain include, but are not limited to, being easily startled, distracted or overreactive to sounds, sights, movements or touches; being slow to focus on, or fail to complete activities of interest; becoming repeatedly sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks; and requiring extra supervision to remain engaged in an activity.  20 C.F.R. § 416.926a(h)(3)(i)-(v).  These examples do not describe a specific degree of limitation in this domain.  20 C.F.R. § 416.926a(h)(3).

In determining that Claimant was less than markedly limited in attending and completing tasks, the ALJ acknowledged that Ms. DuBose-Butler rated Claimant as having marked limitations in this area in a May 2011 assessment.  (Tr. 22.)  However, the ALJ chose not to rely on this finding, noting that Ms. DuBose-Butler was not a medical doctor or psychologist and did not provide any clinical evidence to support her findings.  (*Id.*)  Plaintiff argues that the record as a whole, including evidence from Ms. DuBose-Butler, "overwhelmingly demonstrates" a marked impairment in the area.  (Pl.'s Br. at 20.)  According to Plaintiff, the ALJ lists the evidence she considered in making her determination, but does not provide any rationale to explain how she determined

28

that the evidence showed less than marked limitations.  The Commissioner responds that the totality of the record, as considered by the ALJ, supports a finding of a less than marked limitation in the area.

Substantial evidence in the record – including that which the ALJ considered – may very well support a finding of a marked limitation in attending and completing tasks.  However, the proper inquiry is whether the ALJ's finding that Claimant was less than markedly limited is supported by substantial evidence.  Here, substantial evidence supports the ALJ's conclusion.  While Ms. DuBose-Butler found a marked limitation in the area, state disability medical and psychological consultants Drs. Williams, Hague, Goorey, Dietz, and Mormal, as well as speech and language pathologists Karen Carver and Melissa Hall, all concluded that Claimant did not have any marked impairments.  (Tr. 19, 393, 436, 482.)  Specifically, they found that Claimant's limitation in attending and completing tasks was less than marked.  (*Id.*)  The opinions of a state agency reviewing psychologist constitute expert medical opinion evidence and may constitute substantial evidence when they are supported by the record.  *See* S.S.R. 96-6P, 1996 WL 374180, at *1 (S.S.A.); *Senters v. Sec'y of Health & Human Servs.*, 960 F.2d 150 (Table), 1992 WL 78102, at *3 (6th Cir. Apr. 17, 1992) (citing *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1308-09 (6th Cir. 1990) (per curiam)).  The professionals listed above did not merely find Claimant to have a less than marked limitation in the area without offering any basis for their opinion.  The record shows that in determining that Claimant's ability to attend and complete tasks is less than marked, they considered, among other things, the findings of Dr. House's consultative

examination, psychological evaluations, teacher notes, and reports from Plaintiff.  (Tr. 393, 436, 482.)

Furthermore, the ALJ acknowledged that Luann Kehoe, Claimant's special educational teacher, reported in May 2009 that Claimant had trouble focusing on classroom activities and constantly needed extra assistance to complete class work. (Tr. 23, 141-142.)  However, during that same time period, Plaintiff reported that Claimant keeps busy on his own, finishes things he starts, works on arts and crafts projects, completes homework, and completes chores most of the time.  (Tr. 23, 174.) Claimant's teacher during the 2008-2009 school year commented, after several weeks of having Claimant in class, that "[p]rovided he is taking his medication, he is attentive to instruction, polite and respectful, and involved with his classroom assignments."  (Tr. 198.)  The ALJ noted that in early 2011, the multidisciplinary team drafting Claimant's IEP report noted that he worked very well in small group settings, was very cooperative and helpful to other students, participated in class discussions, and did an excellent job acting as a leader in class discussions.  (Tr. 23, 230-231.)

While the ALJ considered the reports and opinions finding that Claimant had difficulty concentrating and staying on tasks, she ultimately concluded that, considering the record as a whole, Claimant does not have a marked limitation in attending and completing tasks. (Tr. 22-24.)  Accordingly, and for the foregoing reasons, Plaintiff's second assignment of error provides no basis for remand in this case.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

30

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  September 26, 2013

_____